IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LISA A. CUMMINS, ) | CASE NO. 5:21-CV-706 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs.  ) | MAGISTRATE JUDGE |
| ) | JONATHAN D. GREENBERG |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | **MEMORANDUM OF OPINION AND** |
| ) | **ORDER** |
| Defendant. ) | |

Plaintiff, Lisa Cummins ("Plaintiff" or "Cummins"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Disabled Widow's Benefits ("DWB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

In August 2017, Cummins filed applications for POD, DIB, and DWB, alleging a disability onset date of June 17, 2015 and claiming she was disabled due to: neck, knee, depression, back, foot, and anxiety.  Transcript ("Tr.") at 238, 245, 273.  The applications were denied initially and upon reconsideration, and Cummins requested a hearing before an administrative law judge ("ALJ").  Tr. 180.

On July 9, 2019 an ALJ held a hearing, during which Cummins, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 37-65.  On July 19, 2019, the ALJ issued a written

---
[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

decision finding that Cummins was not disabled.  Tr. 18-29.  The ALJ's decision became final on June 9, 2020, when the Appeals Council declined further review.  Tr. 1-3.

On January 31, 2021, Cummins filed her Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 13, 14, 15.  Cummins asserts the following assignment of error:

> Whether the ALJ's finding that Plaintiff's non-Hodgkin's lymphoma did not meet or medically equal Listing 13.05A1 is supported by substantial evidence.

Doc. No. 13, p. 10.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Cummins was born in 1966 and was 48 years old on her alleged disability onset date.  Tr. 27.  She works part-time in a clothing store.  Tr. 45.

### B. Relevant Medical Evidence[2]

Cummins was treated for lymphoma in the 1990s and received treatment for relapses in 1992 and 1995.  Tr. 565.  On September 10, 2010, Cummins saw oncologist Sunitha Vemulapalli, M.D., who evaluated her and detailed her history:

> …[Cummins] is a 43-year old female patient with history of Stage IV B-cell lymphoma initially diagnosed in 1990. At that time, she was residing in Kentucky. She was staged as Stage IV disease. She received CHOP chemotherapy in Ireland Hospital. This resulted in remission. Her first recurrence happened in 1992, at which point she was referred to NCIA Research Facility. She received chemotherapy, the name of which she is currently unclear [on] along with an experimental ricin which was in the form of a pump. This treatment was continued for six treatments. Her second relapse happened in 1995 in the pelvic area, and she received 20 radiation treatments. This put her in early menopause. She received radiation treatments in Akron. Her third recurrence was in 2001 in her lungs. She was treated by Dr. Stallings in Massillon at that time with rituximab for approximately four months. Since then, she has been in remission and has not experienced any relapse. She reports terrible hot flashes, especially going up her spine. She was under the care of Dr. Gabrail until a year ago. She received intermittent gamma globulin infusions

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

2

> initially every three weeks, which was then changed to every five weeks. Her last gamma globulin infusion was a year ago. These infusions were started in 2004 for "bad sinus infections."
>
> \* \* \*
>
> IMPRESSION: This is a 43-year-old female patient with history of Stage IV B-cell non-Hodgkin lymphoma treated with recurrent courses of chemotherapy. The patient is apparently in remission. Her records were reviewed. Her physical examination is without any evidence of lymphadenopathy or hepatosplenomegaly. Re-staging scans will be performed involving her chest, abdomen and pelvis.

Tr. 581, 583.

In December 2010, Cummins had a mammogram ordered by Dr. Vemulapalli that showed a new mass, which was confirmed *via* biopsy to be malignant lymphoma in January 2011.  Tr. 404.  Cummins had a bone marrow biopsy in January due to an abnormal CAT scan, but there was no evidence of lymphoma in her bone marrow.  Tr. 395, 398.  A PET scan affirmed the presence of left breast lymphoma and possible evidence of lymphoma in Cummins' right lung base.  Tr. 393-394.  A left breast biopsy in March showed two types of lymphoma: "approximately 65% of the lymphoma is follicular and 35% is diffuse" and she was diagnosed with B-cell lymphoma, follicular and diffuse mixed type.  Tr. 391.  She underwent a left breast mastectomy in March 2011.  Tr. 385, 439-441.

In May 2011, a thorax CT scan showed a significantly improved left breast lesion, improved right lung base consolidation, and no new lesions.  Tr. 379.

In October 2011, Dr. Vemulapalli updated Cummins' "Problem List" to include, "Left breast lesion, December 2010, associated with splenomegaly, pulmonary nodules.  Patient is status post excision, four weeks of rituximab in March 2011.  Repeat course in October 2011."  Tr. 565.  At that time, Cummins reported feeling exhausted due to working in a shop for 6 hours a day and having busy weekends.  Tr. 565.  She reported 4 total sinus infections during July and August 2011, which required antibiotics.  Tr. 565.  Dr. Vemulapalli wrote that Cummins was on a second course of rituximab infusions

and, based on her frequent infections, resumed IV gamma globulin infusions. Tr. 565. A week later Dr. Vemulapalli noted that she was anemic and ordered blood work. Tr. 556.

In December 2011, a mammogram showed no evidence of malignancy, Tr. 373-374, and a sonogram of Cummins' left breast showed no sonographic evidence of malignancy, Tr. 376.

On January 3, 2012, in response to a request for clearance from Cummins' carpal tunnel doctor regarding surgery, Dr. Vemulapalli wrote that Cummins' lymphoma was "in remission." Tr. 551. Cummins saw Dr. Vemulapalli on January 26 and there was no evidence of disease recurrence. Tr. 546.

In March 2012, Cummins saw Dr. Vemulapalli, who stated that her non-Hodgkin's lymphoma was stable and there was no evidence of disease recurrence. Tr. 537.

In June 2012, an ultrasound of Cummins' left breast showed no evidence of malignancy. Tr. 526.

In April 2014, Cummins saw Dr. Vemulapalli, who noted that a January mammogram was unremarkable. Tr. 468. In September and December 2014, Dr. Vemulapalli's examinations of Cummins showed no evidence of lymphoma of the left breast. Tr. 418, 453.

In June 2014, Steven N. Kelly, M.D., the surgeon who performed Cummins' left breast mastectomy, stated that Cummins had the following impairments: history of breast lymphoma in 2011, generalized abdominal pain, and cholelithiasis. Tr. 1295, 1297. Dr. Kelly opined that Cummins had no limitations on her ability to perform work activity from a general surgery standpoint. Tr. 1296.

In January 2015, a mammogram of Cummins' left breast showed no evidence of malignancy. Tr. 990. In December 2015, a CT of Cummins' abdomen/pelvis showed no evidence of metastatic disease. Tr. 1032.

On January 13, 2016, Cummins saw Dr. Vemulapalli, who wrote that her status was "clinical complete remission." Tr. 1229.

In January 2017, a bilateral mammogram showed no evidence of malignancy. Tr. 829. Dr. Vemulapalli's exams of Cummins in March 2017 showed no evidence of disease recurrence. Tr. 821-822, 1314.

In September 2017, Cummins saw Dr. Vemulapalli, who listed her lymphoma status as complete remission. Tr. 1324. Due to Cummins' frequent sinus infections, Dr. Vemulapalli started her on IVIG treatment. Tr. 1324-1325.

On October 6, 2017, Cummins reported to the Social Security Agency that she has a history of non-Hodgkin's lymphoma. Tr. 288. "She also has other problems, being exhausted and tired." Tr. 288. She had disc problems in her back, back pain, a torn meniscus in her knee, left heel bursitis, neck pain, depression and anxiety, and difficulty sleeping and remembering. Tr. 288. She gets injections from her oncologist for her poor immune system. Tr. 288.

Throughout the remainder of the relevant period, Cummins' records show no evidence of recurrence of lymphoma and continued IVIG infusions without noted complications. *E.g.*, Tr. 1423, 1430-1431, 1626-1630.

**C.     State Agency Reports**

On October 11, 2017, Bruce Mirvis, M.D., reviewed Cummins' file and, regarding her RFC assessment, found that she could perform light work with postural and environmental limitations. Tr. 87-89. Lymphoma was not listed as a severe impairment. Tr. 85. In support of his RFC assessment, Dr. Mirvis wrote that Cummins had a history of breast lymphoma without evidence of recurrence. Tr. 88. On February 5, 2018, Gerald Klyop, M.D., adopted Dr. Mirvis' findings. Tr. 122-123.

**D.     Hearing Testimony**

During the July 9, 2019 hearing, Cummins testified to the following:

- She lives in a house and is able to drive. Tr. 43. Her adult daughter moved in with her about two months ago because she needed a place to stay. Tr. 43. She works part time at a

    clothing store, which she has done since 2008.  Tr. 45.  She works about 2 days a week for 11 or 12 hours total.  Tr. 45, 50.  Other days she calls off; her employer works with her.  Tr. 51.

- She listed her prescribed medications she takes for her thyroid, blood pressure, cholesterol, back and neck pain, depression, anxiety, and for sleep.  Tr. 44.  They cause side effects; they make her more tired and sometimes she doesn't feel well or she feels sick to her stomach or dizzy.  Tr. 45.  Her pain medications help a lot with her pain.  Tr. 46.  She has regular pain management visits and gets trigger point injections that provide about a week of relief.  Tr. 46-47.  Her lower back hurts all the time from arthritis, which she believes was caused by all the bone marrow biopsies she has had in the past.  Tr. 47.

- When asked why she was unable to work, she stated that she felt worn out, tired, exhausted, and in pain every day.  Tr. 45.  When she is at work at her part-time job she has to take extra pain medication to get through the day and when she is done working she sits in her car, exhausted.  Tr. 45.  She can't do anything else other than go home and rest.  Tr. 45.

- She is on her feet during her work shift but she sits down here and there.  Tr. 47.  She estimated that she could be on her feet for about 30 minutes at a time and could walk about 15-20 steps.  Tr. 47, 57.  She also feels pain while sitting.  Tr. 47.  She can lift about 15-20 pounds.  Tr. 57.  Her depression and anxiety cause her to have panic attacks and crying spells.  Tr. 49-50.  She has carpal tunnel syndrome that causes problems with her hands and arthritis in her knees.  Tr. 54, 57.  She had cervical spine fusion surgery in 2009.  Tr. 54.

- On days when she doesn't work, she has no urge to do anything and sits and watches tv all day.  Tr. 51.  She microwaves her meals and cleans as little as possible.  Tr. 51.  On work days she drives to work, about 2-3 miles away.  Tr. 52.  She no longer goes to church because she works every Sunday and is too tired and doesn't get up in time to go.  Tr. 52.  She goes to the grocery store.  Tr. 52.  She has three cats she takes care of.  Tr. 53.

- She was diagnosed with non-Hodgkin's lymphoma when she was 23 years old.  Tr. 55.  She gets IVIG (intravenous gamma globulin) treatment because her immune system is compromised.  Tr. 55.  For that, she goes back in the "chemo room" and they hook her up to an IV; they also give her Benadryl, Tylenol, and prednisone at the time of her treatment.  Tr. 55-56.  It used to take 5-6 hours and now it takes less than 4 hours.  Tr. 56.  She gets them about every 2 months.  Tr. 56.  She is very tired that day and the next day.  Tr. 56.

The ALJ asked the VE whether a hypothetical individual with the same age and education as Cummins could perform any work if the individual had the limitations assessed in the ALJ's RFC determination, described below.  Tr. 59-60.  The VE answered that such an individual could perform the following representative jobs in the economy: mail clerk, inspector/hand packager, and electrical accessories assembler.  Tr. 61.  When asked about the permitted off-task and absenteeism rate in the

6

workplace, the VE stated that an individual could be off-task no more than 15% of the day or absent no more than twice a month. Tr. 62-64.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive DWB. 20 C.F.R. § 404.335. To receive DWB, a claimant must meet certain marital requirements. *Id*.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age,

education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.

2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3. The prescribed period ends on July 31, 2021.

4. The claimant has not engaged in substantial gainful activity since June 17, 2015, the alleged onset date (20 CFR 404.1571 *et seq*.).

5. The claimant has the following severe impairments: degenerative disc disease, osteoarthritis, obesity, carpal tunnel syndrome, depression and anxiety (20 CFR 404.1520(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

7. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b). Specifically, she could never climb ladders, ropes or scaffolds. She could occasionally climb ramps and stairs, stoop and crouch. She could never kneel or crawl. She could occasionally reach overhead bilaterally. The claimant could frequently handle and finger bilaterally. She must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. She is limited to simple, routine tasks that do not involve arbitration, negotiation or confrontation. Work should not require directing the work of others or being responsible for the safety or welfare of others. The claimant requires jobs with no piece rate work or assembly line work. She is limited to

        occasional interaction with others.

8.     The claimant has no past relevant work (20 CFR 404.1565).

9.     The claimant was born on November \*\*, 1966 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

10.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

11.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

12.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

13.     The claimant has not been under a disability, as defined in the Social Security Act, from June 17, 2015, through the date of this decision (20 CFR 404.1520(g)).

Tr. 21-28.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at \* 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot

determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

At step two, the ALJ found that Cummins' non-Hodgkin's lymphoma was a non-severe impairment. Tr. 21. Cummins does not argue that was error. Rather, she argues that the ALJ erred because he did not consider whether her non-Hodgkin's lymphoma satisfied Listing 13.05 (Lymphoma) at step three and asserts that the evidence in the record raises a "substantial question" regarding whether she met or equaled Listing 13.05A1. Doc. No. 13, p. 11. Defendant argues that the ALJ was not required to consider her history of lymphoma at step three because he found it was a non-severe impairment at step two. Doc. No. 14, p. 7 (citing 20 C.F.R. § 404.1525(a)). Moreover, Defendant asserts, Cummins has not shown that there is a "substantial question" as to whether her lymphoma could satisfy the criteria of a listing. Doc. No. 14, p. 8. In reply, Cummins submits that she is not required to show that her lymphoma was a "severe impairment" at step two to prevail and maintains that she has raised a substantial question regarding whether she satisfied Listing 13.05A1. Doc. No. 15, p. 2.

First, Cummins has not shown that an ALJ is required to consider whether a non-severe impairment meets or equals a listing at step three. The cases she cites do not support her assertion. Doc. No. 15, p. 2. In *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987), the Court rejected Maziarz's argument that the ALJ erred when he determined that Maziarz' cervical spine impairment was not severe at step two because the ALJ found that Maziarz' other impairments were severe and continued with the remaining steps in the disability determination. The Court wrote, "Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the

11

Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error." *Id*. The Court in *Fisk v. Astrue*, 253 Fed.App'x 580, 583-584 (6th Cir. 2007) and *Lawson v. Chater*, 98 F.3d 1342, at *3 (6th Cir. 1996), both cited by Cummins, relied on *Maziarz* and reiterated that an ALJ is required to consider the claimant's non-severe impairments when assessing the RFC at step four. None of those cases cited by Cummins held that an ALJ is required to consider a non-severe impairment at step three. Cummins also relies on SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996), but that ruling applies to RFC findings, not step three evaluations. She concedes that the ALJ considered her history of lymphoma when assessing her RFC. Doc. No. 15, p. 2; Tr. 23, 25. Thus, to the extent Cummins argues that the ALJ was required to consider her history of lymphoma at step three, her argument fails. *See, e.g.*, *Robinson v. Comm'r of Soc. Sec.*, 2014 WL 3528434, at *13 (E.D. Mich. July 16, 2014) (an ALJ is not required to evaluate a non-severe impairment at step three, citing cases).

Nevertheless, a finding at step two that an impairment is not severe is "fundamentally inconsistent" with facts showing that that impairment satisfies a listed impairment at step three. *Williamson v. Sec'y of Health & Hum. Servs.*, 796 F.2d 146, 151 (6th Cir. 1986).

> Consequently, if a court's reading of the record should reveal that the listing's criteria are satisfied according to valid tests and credible reports, an ALJ's finding of no severe impairment at step two cannot be found to be supported by substantial evidence. We do not mean to reorder the sequential process to require that the ALJ consider whether a claimant's impairment meets the listing before deciding whether the impairment is severe; we merely conclude that a finding of non-severity at step two cannot be supported by substantial evidence when it appears that the listed criteria are met.

*Id*.

Cummins argues that she meets Listing 13.05A1, non-Hodgkin's lymphoma that is aggressive (including diffuse large B–cell lymphoma) persistent or recurrent following initial anticancer therapy. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. "Persistent means the planned initial anticancer therapy failed to

achieve a complete remission of your cancer; that is, your cancer is evident, even if smaller, after the therapy has ended." *Id*., 13.00(I)(5).  "Recurrent or relapse means the cancer that was in complete remission or entirely removed by surgery has returned." *Id*., 13.00(I)(7).  "Anticancer therapy means surgery, radiation, chemotherapy, hormones, immunotherapy, or bone marrow or stem cell transplantation.  When we refer to surgery as an anticancer treatment, we mean surgical excisions for treatment, not for diagnostic purposes." *Id*., at 13.00(I)(1).  Finally, the prefatory language of the Listing section 13.00 for Cancer explains how long the Commissioner considers an impairment to be disabling:

> 1. In some listings, we specify that we will consider your impairment to be disabling until a particular point in time (for example, until at least 12 months from the date of transplantation). We may consider your impairment to be disabling beyond this point when the medical and other evidence justifies it.
>
> 2. When a listing does not contain such a specification, we will consider an impairment(s) that meets or medically equals a listing in this body system to be disabling until at least 3 years after onset of complete remission. When the impairment(s) has been in complete remission for at least 3 years, that is, the original tumor or a recurrence (or relapse) and any metastases have not been evident for at least 3 years, the impairment(s) will no longer meet or medically equal the criteria of a listing in this body system.
>
> 3. Following the appropriate period, we will consider any residuals, including residuals of the cancer or therapy (see 13.00G), in determining whether you are disabled. If you have a recurrence or relapse of your cancer, your impairment may meet or medically equal one of the listings in this body system again.

*Id*., 13.00(H).

Here, the ALJ summarized Cummins' history of lymphoma:

> The claimant was diagnosed with Stage IV B-cell lymphoma in 1990. She received chemotherapy, which resulted in remission. Her first recurrence was in 1992 and again receiving chemotherapy. Her second relapse occurred in 1995 in the pelvic area, and she received twenty radiation treatments. Her third recurrence was in 2001 in her lungs, and she was treated with rituximab for four months. She visited Morning Star Hematology Oncology Associates (Morning Star) on September 10, 2010 for an oncological evaluation. (3F/136). In March 2011, she underwent a mastectomy of left breast lymphoma. (1F/46) In December 2014, the claimant declined IVIG injections, citing lack of infections. (B3F/2) However, she subsequently started the injections. (B17F/3) She continued preventive care and screenings. There was no evidence of

13

recurrence in 2017, 2018 or 2019. (16F/4; 23F/8-9; 32F/2-3)

Tr. 25.

Cummins reiterates her history of non-Hodgkin lymphoma beginning in the early 1990s to her early 2011 findings of "the aggressive B-cell lymphoma she had been dealing with for decades and a new indolent follicular small cleaved cell lymphoma." Doc. No. 13, p. 14. She writes, "The presence of multiple recurrences of B-cell lymphoma following Plaintiff's initial anticancer therapy raises a 'substantial question' over whether her lymphomas met or medically equaled Listing 13.05A1 during the relevant time period." Doc. No. 13, pp. 14-15. She submits that the record contains two references to two different dates of her having achieved remission: a January 3, 2012 handwritten note from her oncologist Dr. Vemulapalli that Cummins' lymphoma was "in remission"; and a January 13, 2016 treatment note in which Dr. Vemulapalli wrote that her lymphoma was in "complete remission." Doc. No. 13, p. 15 (citing Tr. 551, 1229). She asserts that the listing specifies a "complete remission" and that, pursuant to 13.00(H)(2), her lymphoma "appeared to have met the requirements" of the listing until January 13, 2019, 3 years after the onset of "complete remission." Doc. No. 13, p. 15; Doc. No. 15, p. 3.

The Court finds that Cummins has failed to show that her lymphoma had not been in complete remission for 3 years by June 2015, her alleged onset date. "Complete remission" means "the original tumor or a recurrence (or relapse) and any metastases have not been evident for at least 3 years." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 13.00(H)(2). Cummins has not shown evidence of lymphoma after January 2012, when her oncologist stated that her lymphoma was in remission. Thus, 3 years later, in January 2015, her lymphoma was in "complete remission" per the regulations and no longer met or medically equaled Listing 13.05A1. Because Cummins' alleged onset date is June 17, 2015, her lymphoma remained in complete remission during the relevant time period.[3]

---

[3] Cummins argues that she was eligible for DWB benefits beginning in July 5, 2014. Doc. No. 13, p. 15, n.5. But she does not dispute that, despite that eligibility, her alleged onset day was a year later, in June 2015. Tr. 246.

14

Cummins complains that the ALJ did not make a finding that her lymphoma had been in complete remission for 3 years prior to her alleged onset date and that that argument was advanced by defense counsel *post-hoc*.  Doc. No. 15, p. 4.  While true that the ALJ did not use the words "complete remission" when discussing Cummins' history of lymphoma, the ALJ remarked that Cummins' last instance of lymphoma was in March 2011 and that there was no evidence of recurrence.  Tr. 25.  Thus, the Court finds that the ALJ considered that she had had no recurrence since her treatment in 2011, *i.e.*, she achieved complete remission prior to her alleged onset date.

Finally, Cummins argues that the ALJ should have considered the "residual effects" of her cancer and anti-cancer therapy per 13.00(H)(3).  Doc. No. 13, pp. 15-16.  She explains that she "continued to require anticancer therapy in the form of monthly immunotherapy infusions.  Doc. No. 13, p. 16.  But her IVIG infusions were not "anticancer therapy" pursuant to 13.00(H)(3) and 13.00(G) because they were not used to treat cancer, but to boost her immune system to prevent infections, as the ALJ observed.  Tr. 23.  The ALJ recognized that she received those treatments every two months.  Tr. 23.

In sum, the Court finds that Cummins has not shown that the ALJ's step two finding is "fundamentally inconsistent" with evidence in the record regarding whether she can satisfy Listing 13.05A1, *Williamson*, 796 F.2d at 151, nor has she raised a "substantial question" regarding whether she meets that listing, *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641-42 (6th Cir. 2013).  Thus, the Court finds that the ALJ did not err when he did not evaluate Listing 13.05A1 at step three.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

Date: April 14, 2022
            *s/ Jonathan Greenberg*
            Jonathan D. Greenberg
            United States Magistrate Judge